Not for Publication

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

**UNITED STATES OF AMERICA**,

                                Plaintiff,

            v.

**LEE CARABALLO**

                                Defendant.

Criminal No. 14-0255

OPINION

**SALAS DISTRICT JUDGE**

      Before the Court is defendant Lee Caraballo's ("Defendant") motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). (D.E. No. 64 ("Motion")). Having considered the parties' submissions, the Court decides this matter without oral argument. *See* Fed. R. Crim. P. 43(b)(4); *United States v. Styer*, 573 F.3d 151, 154 (3d Cir. 2009). For the following reasons, the Court DENIES the Motion.

**I.    BACKGROUND**

      On November 17, 2014, Defendant was found guilty of: (i) carjacking in violation of 18 U.S.C. § 2119(1) & 2, and (ii) using a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(ii) & 2. (D.E. No. 54, Judgment in a Criminal Case, at 1). After considering the relevant factors under 18 U.S.C. § 3553(a), submissions by counsel, the Presentencing Report, and arguments made at the sentencing hearing, the Court sentenced Defendant to a total term of 135 months' imprisonment. (D.E. No. 57 ("Sentencing Tr.") at 40:8–14). That is, 51 months on Count 1 and 84 months on Count 2 running consecutively. (*Id.*). Following release from imprisonment, Defendant is scheduled to be placed on supervised release for three years on Count 1 and for five

1

years on Count 2, the terms of which are to run concurrently. (*Id.* at 40:15–19). Defendant is currently serving his sentence at the Federal Correctional Institution, Fort Dix in Burlington County, New Jersey ("FCI Fort Dix"). (*See* D.E. No. 64-1 at 22[1]). His projected release date is October 21, 2023, and he will be eligible for home detention on April 21, 2023. (*Id.* at 1 & 3).

Defendant moves for a reduction of his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A). He argues that the COVID-19 pandemic, the conditions at FCI Fort Dix, and his mental conditions—namely, anxiety, major depressive disorder, and substance use disorder—create extraordinary and compelling circumstances to warrant a reduction in his sentence to time served. (*See generally* Motion). On May 6, 2021, the Government submitted its opposition to Defendant's Motion, (D.E. No. 68 ("Gov. Opp. Br.")), to which Defendant replied on July 1, 2021 (D.E. No. 70 ("Def. Reply Br.")).[2] On September 2, 2021, in light of the Centers for Disease Control's ("CDC") updated guidelines regarding the COVID-19, the Court ordered the Government to file Defendant's medical records and the parties to file supplemental briefs addressing Defendant's alleged substance use disorder. (D.E. No. 71). The Government filed its supplemental brief with Defendant's medical records (D.E. No. 74 ("Gov. Supp. Br.") & D.E. No. 75 ("Med. Rec."[3])), to which Defendant responded (D.E. No. 79 ("Def. Supp. Br.")).

## II.     LEGAL STANDARD

Once a term of imprisonment has been imposed, the Court may only modify it under very

---

[1] Unless otherwise specified, pin cites to the exhibits filed with Defendant's Motion refer to the pagination generated by the Court's Electronic Court Filing system.

[2] The Government argues that Defendant also seeks home confinement under 18 U.S.C. § 3624(c)(2), which the Court lacks the authority to address. (Gov. Opp. Br. at 17–18). It is not apparent to the Court that this Motion actually seeks any relief under § 3624(c), and the Government fails to cite to Caraballo's submissions to indicate as such. However, to the extent that such relief is sought, the Court indeed lacks the authority to address a prisoner's request for home confinement under § 3624(c). 18 U.S.C. § 3624(c); *see also id.* § 3621(b) (stating that "[t]he Bureau of Prisons shall designate the place of the prisoner's imprisonment").

[3] Unless otherwise specified, pin cites to Defendant's medical records refer to the pagination automatically generated by the Court's Electronic Case Filing system.

limited circumstances. *In re Morris*, 345 F. App'x 796, 797–98 (3d Cir. 2009) (citing 18 U.S.C. § 3582(c)). Relevant here, 18 U.S.C. § 3582(c)(1) provides that, in any case:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that-
>
> (i). extraordinary and compelling reasons warrant such a reduction;
>
> [. . .]
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Per Congressional directive and prior to the enactment of the First Step Act, the Sentencing Commission issued a policy statement addressing motions filed by the Director of the BOP. U.S. Sent'g Guidelines Manual ("U.S.S.G.") § 1B1.13 (U.S. Sent'g Comm'n 2018). However, the Sentencing Commission has not updated its policy statement since the First Step Act expanded relief under § 3582(c)(1)(A) by permitting defendant-filed motions for a sentence reduction. Thus, the Third Circuit recently joined the growing list of Courts of Appeals and held that, because the Sentencing Commission's policy statement "explicitly limits its application to [BOP]-initiated motions," the policy statement does not bind the Court. *United States v. Andrews*, 12 F.4th 255, 259 (3d Cir. 2021). Accordingly, no applicable policy statement exists for § 3582(c)(1)(A) motions initiated by a defendant.

Nonetheless, defendants still bear the statutory burden to demonstrate that they are entitled to a sentence reduction by satisfying procedural perquisites and showing extraordinary and

3

compelling circumstances. 18 U.S.C. § 3582(c)(1)(A); *see United States v. Epstein*, No. 14-0287, 2020 WL 1808616, at *2 (D.N.J. Apr. 9, 2020). In addition, the Court must find that "the applicable sentencing factors under § 3553(a) warrant a reduction." *United States v. Sparrow*, No. 18-0653, 2020 WL 4364328, at *2 (D.N.J. July 30, 2020); 18 U.S.C. § 3582(c)(1)(A).

### III. ANALYSIS

#### A. Exhaustion

Before proceeding to the merits of a motion for a reduction in sentence, a defendant must meet § 3582(c)(1)(A)'s exhaustion requirement, which requires that the defendant exhaust all administrative remedies, or that 30 days have passed since the submission of a request to the warden. *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). As the Third Circuit held in *Raia*, "strict compliance" with the exhaustion requirement is critical, and a defendant's failure to comply "presents a glaring roadblock foreclosing compassionate release at this point." *Id.* However, while compliance with § 3582(c)(1)(A) is mandatory, "the longest period of time that [a] [d]efendant will need to wait before filing his motion is 30 days." *United States v. Epstein*, No. 14-0287, 2020 WL 1808616, at *4 (D.N.J. Apr. 9, 2020).

It is undisputed that, on November 30, 2020, Defendant filed a letter to the warden of FCI Fort Dix ("Warden") seeking "Compassionate Release/Reduction in Sentence and Home Confinement" based on his medical condition and the threat of COVID-19. (D.E. No. 64-1 at 22–28; Motion at 41; Gov. Opp. Br. at 2). It is also undisputed that, on December 14, 2020, the Warden "responded with neither an approval or [sic] denial, but a request for more information," to which Defendant did not respond. (Motion at 41; D.E. No. 64-1 at 29–30; *see* Gov. Opp. Br. at 2–3). Finally, the record indicates that Defendant filed the instant Motion on April 6, 2021, well beyond 30 days after he filed his request to the Warden. (Motion).

4

The Government argues that Defendant did not exhaust the administrative process because he failed to respond to the Warden's demand that he "resubmit his request and include a detailed release plan." (Gov. Opp. Br. at 3). The Government further argues that the exhaustion requirement under § 3582(c)(1)(A) is jurisdictional, and that, if the jurisdictional debate "is ultimately academic," the exhaustion requirement is nonetheless mandatory. (Gov. Opp. Br. at 8–11). In response, Defendant appears to argue that the letter he submitted to the Warden "followed Program Statement 5050.50 and 28 C.F.R. § 571.61." (Def. Reply Br. at 9). According to Defendant, he did not provide more information to the Warden because such information would be futile in light of the Bureau of Prisons's ("BOP") narrow interpretation of the operative policy statement. (*Id.*).

The Court agrees with the Government that the exhaustion requirement is mandatory and must be strictly followed by the Court. *See Raia*, 954 F.3d at 594. The pertinent issue in the instant case, however, is whether Section 3582(c)(1)(A)'s mandatory requirement is met when a defendant filed a request for compassionate release that was deemed incomplete or procedurally defective by the BOP, and when the defendant, instead of responding to the BOP's request for more information, waited 30 days before filing his motion for compassionate release with the Court. Neither party presents any law, or any argument for that matter, on this issue.

As discussed above, Section 3582(c)(1)(A) allows a defendant to seek compassionate release before the court if he first makes a "request" to the BOP and waits thirty days for the BOP's response. 18 U.S.C. § § 3582(c)(1)(A); *United States v. Harris*, 973 F.3d 170, 171 ("[T]he statute states that the defendant may file the motion thirty days after the warden receives his request."). The statute, however, does not specify what constitutes a "request." The BOP Program Statement No. 5050.50 (the "Program Statement 5050.50"), which was promulgated by the BOP in

furtherance of its statutory role and was codified under 28 C.F.R. §§571.60–571.64, provides the procedure on how to file a request for compassionate release with the BOP and how the BOP assesses a defendant's request.  BOP Program Statement 5050.50, *Compassionate Release/ Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)* (Jan. 17, 2019), https://www.bop.gov/policy/progstat/5050_050_EN.pdf.  Relevant here, Section 571.61 of Program Statement 5050.50 provides that:

> The inmate's request shall at a minimum contain the following information: (1) The extraordinary or compelling circumstances that the inmate believes warrant consideration; (2) Proposed release plans, including where the inmate will reside, how the inmate will support himself/herself, and, if the basis for the request involves the inmate's health, information on where the inmate will receive medical treatment, and how the inmate will pay for such treatment.

In other words, a "request" to the BOP for compassionate release must include two categories of information: the extraordinary or compelling circumstances at issue and a proposed release plan.

In his November 30, 2020 letter to the BOP, Defendant stated that his release plan, in its entirety, was the following: "If I am granted the requested relief, I intend to reside with both my parents in Yauco, Puerto Rico.  I will obtain Medicade [sic] health insurance and continue with my mental health treatment at the nearest health center." (D.E. No. 64-1 at 28).  The Warden's December 14, 2020 letter informed Defendant that all requests for compassionate releases "require a detailed release plan (employment, medical and financial)" and that, if Defendant "still wish[ed] to be considered for Compassionate Release/RIS," he must re-submit his request with such a release plan. (*Id.* at 30).  As discussed above, Defendant did not respond to the Warden's letter.[4]

---

[4]   In his supplemental brief filed on November 23, 2021, Defendant argues for the first time that, instead of his parents' residence in Yauco, Puerto Rico, his release plan is to be "released to halfway house for six months and then transition to an in-patient rehabilitative treatment program approved by the Court." (Def. Supp. Br. at 2).  Alternatively, Defendant proposes that "he will reside with his brother in New Jersey, and seek in-patient programming to address his substance abuse disorder." (*Id.*).  The Court notes that this release plan is significantly different from what Defendant presented to the Warden.  Regardless, because the new release plan was never before the Warden, it is irrelevant to the exhaustion analysis.

The Court finds that Defendant's letter to the BOP lacked the information required under Program Statement 5050.50. While Defendant admitted that "28 C.F.R. § 571.61 clearly instructed the defendant" to include a "detailed release plan[]" when requesting compassionate release, his release plan, at the very least, did not include the required information on how he will support himself if he was to be released. *See* 28 C.F.R. § 571.61. The BOP's standard "Compassionate Release/Reduction in Sentence Application Form," which Defendant filed as support to his Motion, also requires the prisoner to provide information on the "name and contact information of who [the prisoner] will live with," "the last time [the prisoner] spoke to this person about [the] release plan," the address of where the prisoner intends to live, and "how [the prisoner] will . . . pay for [his or her] medical treatment." (D.E. No. 64-1 at 32). None of such information was included in Defendant's letter to the BOP. (*See id.* at 22–28). Thus, it cannot be said that Defendant submitted "a release plan" as required under 28 C.F.R. § 571.61, or that the BOP had an opportunity to meaningfully review and respond to Defendant's request. *See Raia*, 954 F.3d at 597 (holding that "strict compliance with § 3583(c)(1)(A)'s exhaustion requirement" is of critical importance and emphasizing that the defendant must give the BOP thirty days to respond). Accordingly, it is doubtful that Defendant has made a proper "request" to the BOP in order to exhaust his administrative remedies under § 3583(c)(1)(A). In any event, even if Defendant has satisfied the exhaustion requirement, as discussed below, his claim fails on the merits.

B. **Extraordinary and Compelling Reasons for Reduction**

As discussed above, prior to the enactment of the First Step Act, the Sentencing Commission issued a policy statement for § 3582(c)(1)(A) motions initiated by the Director of the BOP. U.S.S.G. § 1B1.13. The policy statement specifies that extraordinary and compelling reasons for compassionate release exist when, *inter alia*, the defendant is "suffering from a serious

physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." *Id.* at cmt. n.1(A)(ii)(I). In addition, the policy statement includes a catchall provision that allows the Director of the BOP to determine if "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with" the enumerated reasons described in the policy statement. *Id.* at cmt. n.1(D). While the Court is not constrained by the Sentencing Commission's policy statement, it will refer to it as guidance in determining whether extraordinary and compelling reasons exist for a sentence reduction. *See Andrews*, 12 F.4th at 258–59.

In the context of defendant-filed compassionate release motions in the wake of COVID-19, courts consistently consider two components under the extraordinary and compelling circumstances analysis: "(a) identification of a medical condition that renders the defendant particularly vulnerable to serious consequences if infected with COVID-19; and (b) the likelihood of COVID-19 infection, with particular reference to conditions in the institution in which the defendant is incarcerated." *United States v. Moore*, No. 19-0101, 2020 WL 4282747, at *3 (D.N.J. July 27, 2020). With respect to evaluating defendants' medical conditions, courts have used as guideposts the CDC's list of medical conditions that can make individuals "more likely to get severely ill from COVID-19." *See People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated Dec. 14, 2021) (last visited Jan. 6, 2022) ("CDC Medical Conditions List"); *see e.g.*, *United States v. Dent*, No. 18-20483, 2020 WL 4783921, at *3 (E.D. Mich. Aug. 17, 2020) (relying on the CDC's classifications to conclude that defendant's cited medical condition was insufficient to meet the extraordinary and compelling standard); *United States v.*

*Henries*, No. 00-0788, 2020 WL 4727090, at *2 (D.N.J. Aug. 14, 2020) (same).

With respect to the likelihood of COVID-19 infection, courts in the Third Circuit and around the country have increasingly addressed the impact of vaccination when considering motions for compassionate release, taking into account, *inter alia*, the availability of COVID-19 vaccines at prisons, the rates of vaccination among the inmate population and staff, and the defendants' vaccination records. *See, e.g.*, *United States v. Battle*, No. 21-2151, 2021 WL 4550925, at *2 (3d Cir. Oct. 5, 2021) (finding no "extraordinary and compelling reasons" when, despite his health conditions, the defendant was fully vaccinated); *United States v. Kirkland*, No. 06-0911, 2021 WL 1541068, at *5 (D.N.J. Apr. 20, 2021) (holding that the defendant failed to establish an extraordinary and compelling reason for release because he and inmates in his wing were fully vaccinated and because the vaccination was highly effective); *United States v. Martin*, No. 98-0178, 2021 WL 4169429, at *6 (E.D. Pa. Sept. 14, 2021) (collecting cases holding that the risk of infection from the Delta variant does not create extraordinary and compelling reasons for release when the defendant and the majority of his fellow inmates were fully vaccinated); *United States v. Bonilla*, No. 20-0083, 2021 WL 3634181, at *2 (D.N.J. Aug. 17, 2021) (collecting cases holding that an inmate's refusal to be vaccinated in the absence of a legitimate medical reason was fatal to establishing an "extraordinary and compelling" reason for compassionate release). With these decisions in mind, the Court will examine Defendant's medical conditions and his likelihood of being infected by the virus that causes COVID-19.

Defendants' medical records indicate that he was diagnosed with adjustment disorders with mixed anxiety and depressed mood and unspecified depressive disorder. The conditions were apparently diagnosed initially in November 2015 (*id.* at 34) and continued to the present (*id.* at 63–64). Defendant argues that his "mental health has been deteriorating" during the pandemic

because the lockdown affected his access to treatment and his ability to see his family. (Motion at 36–37). Defendant also "self-reports having trouble concentrating, sleeping, and eating, and feels constantly stressed that he cannot be with his wife and daughter during this pandemic." (*Id.* at 37). Defendant apparently argues that his mental conditions caused "prolonged and extremely high levels of psychological stress," putting him at a higher risk of having a suppressed immune system and making him more likely to contract COVID-19 and become severely sick. (*See id.* at 37–39).

It appears, however, that Defendant's mental conditions are currently under control. The medical records indicate that Defendant stopped taking his anti-anxiety and anti-depression medications at one point because he felt better and thought "he didn't need medication." (*Id.* at 38). In December 2020, however, he requested to renew his previous treatment for depression and anxiety. (*Id.*). By June 25, 2021, after the instant Motion was filed, Defendant reported that, while he was "stressed about his family and COVID," "the current medication is helping." (*Id.* at 63).

Defendant also fails to explain how the alleged symptoms "substantially diminish [his] ability to provide self-care within the environment of a correctional facility and from which he . . . is not expected to recover." *See* U.S.S.G. § 1B1.13, cmt. n.1(A). Indeed, this Court has repeatedly held that mental health conditions, such as those of the Defendant's, do not support a finding of "extraordinary and compelling" reasons for relief. *See, e.g.*, *United States v. Martinez*, No. 17-171, 2021 WL 2651663, at *2 (D.N.J. June 28, 2021) (holding that Defendant's conclusory suggestion that substance abuse causes reduced immune response is "insufficient to demonstrate that he is at an elevated risk from COVID-19"); *United States v. Leathers*, No. 19-633, 2020 WL 2219853, at *2 (D.N.J. May 7, 2020) (denying compassionate release where defendant failed to explain how his anxiety and depression made him more likely to contract COVID-19).

With respect to Defendant's alleged substance use disorders, it appears that Defendant was

10

never diagnosed with this condition. His medical records only indicate two occasions when Defendant self-reported that he had a history of substance abuse: one in May 2018 (with respect to tranquilizers and marijuana), and another in July 2019 (with respect to alcohol and tobacco). (Med. Rec. at 7 & 22). During the May 2018 visit, Defendant was informed of the withdrawal symptoms of substance abuse, such as "tremors, chills, sweats, nausea, vomiting, blurred vision," which he reported that he had none. (*Id.* at 7). Defendant was instructed to notify staff immediately if his condition changed, and there is no record of Defendant reporting any withdrawal symptoms or diagnosis of any kind regarding his substance abuse. In his supplemental brief, Defendant apparently argues that the security files maintained by the Special Investigation Service at FCI Fort Dix would show that Defendant smoked tobacco while incarcerated, in violation of BOP's policy. (Def. Supp. Br. at 1). According to Defendant, such security files indicate that he continues to suffer from substance abuse disorders. (*Id.*). The Court disagrees. The purported Special Investigative Service files do not change the fact that Defendant was never diagnosed with substance use disorder and that he never complained about having any withdrawal symptoms. Accordingly, the Court will not consider the alleged substance use disorder for Defendant's request for compassionate release.[5]

Finally, Defendant argues that FCI Fort Dix has been unsuccessful at protecting inmates from COVID-19. (*See generally* Motion at 16–35). Since the onset of the pandemic, FCI Fort Dix has had 1,582 inmates and 108 staff members test positive for and recover from COVID-19. *See COVID-19 Cases*, BOP, https://www.bop.gov/coronavirus/ (last visited Jan. 6, 2022).

---

[5] Defendant does not raise this argument, but his medical records do indicate that he was a cigarette smoker. (Med. Rec. at 22). The CDC Medical Conditions List states that being a *former* cigarette smoker "can" make a person "more likely to get severely ill from COVID-19. The Court notes, however, that Defendant was infected with the virus that causes COVID-19 and was asymptomatic despite being a former smoker. (*See id.* at 69). Moreover, for the reasons stated herein, Defendant's status as a former cigarette smoker does not change the Court's conclusion that he fails to show any extraordinary and compelling reasons for a sentence reduction.

11

Currently, the facility has ten inmates infected with COVID-19; twelve staff have the virus. *Id.* FCI Fort Dix houses a total of 3,347 inmates, and the facility has completed 2,219 inoculations. *See COVID-19 Vaccination Implementation*, BOP, https://www.bop.gov/coronavirus/ (last visited Jan. 6, 2022). All approved vaccines are highly effective "at preventing laboratory-confirmed COVID-19 infection in people who received two doses and had no evidence of being previously infected." *See generally Different COVID-19 Vaccines*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines.html (individual websites of the three vaccines stating that Pfizer-BioNTech, Moderna, and Johnson & Johnson's Janssen are 95%, 94.1%, and 66.3% effective, respectively) (last visited Jan. 6, 2022). As discussed above, the vaccines' effectiveness has been observed "among people of diverse age, sex, race, and ethnicity categories and *among people with underlying medical conditions*." *See, e.g., Moderna COVID-19 Vaccine Overview and Safety*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/Moderna.html (emphasis added) (last visited Jan. 6, 2022). All approved vaccines are also "highly effective at preventing severe disease and death, including against the Delta variant." *Delta Variant: What We Know About the Science*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (last updated Aug. 26, 2021) (last visited Jan. 6, 2022). Given the low infection rate and the high vaccination rate at Defendant's facility, the Court finds that Defendant fails to show that he is at a greater risk of reinfection.[6]

For these reasons, Defendant fails to present extraordinary and compelling reasons for a sentence reduction. Because Defendant does not pass the initial threshold under Section 3582, the Court need not consider the applicable Section 3553(a) factors. However, the Section 3553(a)

---

[6] The Court's conclusion is independent of the apparent fact that Defendant declined to receive a COVID-19 vaccine. (Med. Rec. at 77).

factor analysis, as explained below, gives further reasons and strongly supports a denial of Defendant's instant Motion.

### C. Section 3553(a) Factors and Dangerousness

The applicable Section 3553(a) factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

These factors are examined in the context of the requirement that the court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)." 18 U.S.C. § 3553(a).

At his sentencing hearing, the Court noted that Defendant was involved in a serious and violent crime—carjacking and brandishing a firearm during a crime of violence. (Sentencing Tr. at 34:19–23). The Court observed the need for Defendant to "understand and respect the laws" and the importance of imposing a sentence that is sufficient to "send that message" to the Defendant. (*Id.* at 34:24–35:4). Accordingly, the Court imposed a sentence that "specifically deters [Defendant] from ever committing any other crimes," especially carjacking, "in the future." (*Id.* at 35:7–11). Similarly, the Court determined that general deterrence was "critical" to send a message to society that "if you are going to carjack anyone in the United States, and specifically in Newark" the Court will "treat carjacking extremely serious" and will not "impose a sentence

13

that doesn't send that message. . . ." (*Id.* at 35:12–23). Lastly, the Court considered the "need to protect the public from any further crimes of this [Defendant]" (*id.* at 35:24–36:5) and the need to "avoid unwarranted sentence disparities among defendants with similar records . . . ." (*Id.* at 39:24–40:2). Nevertheless, the Court took into consideration Defendant's minimal record and his attempt to be a good father to his daughter. (*See id.* at 39:17–23). Ultimately, the Court sentenced Defendant to the lowest sentence within the applicable range, resulting in a total term of 135 months. (*Id.* at 40:8–14).

According to the Sentence Monitoring Computation Data filed by Defendant, as of February 2, 2021, Defendant has served 62.4% of the full term imposed by the Court, or 72.1% of his expected term, taking into account the good time credit he received. (D.E. No. 64-1 at 3). The Court is not persuaded that a sentence of 94 months, which is the amount of time Defendant has served as of December 2021, is sufficient punishment and provides the general and specific deterrence referred to by the Court in fashioning Defendant's 135-month sentence. To reduce Defendant's sentence also undermines some of the other factors that the Court considered and still hold true today—namely, the seriousness of the offense, the need to promote respect of the law, and perhaps most importantly, the need to protect the public from any crimes committed by Defendant. In short, the analysis under Section 3553(a) weighs heavily against granting Defendant's release.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion is DENIED. An appropriate Order accompanies this Opinion.

Date:  January 6, 2022                                            s/*Esther Salas*
                                                                                      **Esther Salas, U.S.D.J.**